FARMERS STATE BANK OF WAUPACA, Appellant, vs.
HANSEN, Respondent.

*February 8—May 3, 1921.*

*Guaranty: Release of liability by fraud of creditor: Failure to give notice of nonpayment: Collusion between creditor and guarantee: What constitutes fraud sufficient to discharge guarantor.*

1. Sec. 1679—1, Stats., specifying the conditions under which a person secondarily liable on a negotiable instrument may be discharged, does not specify all the instances or contingencies that may arise to release a guarantor; but action on the part of a creditor after a note is due which amounts to a fraud on the guarantor, misleading him and depriving him of an opportunity of recoupment and protection, may discharge the guarantor.

2. Conduct such as will release a guarantor cannot arise from mere passivity on the part of a creditor, but must consist of some affirmative act or connivance or gross negligence amounting to a fraud.

3. The payee of a note is not required to notify the guarantor of the maker's nonpayment.

4. A guarantor who expressly waived notice of nonpayment of a note was not discharged by the failure of the payee to notify him of nonpayment, regardless of the reasons which prompted the payee not to give such notice.

5. If the cashier of a bank, which was the payee of a note, and the maker agreed that the fact of nonpayment should be mis-

Farmers State Bank v. Hansen, 174 Wis. 100.

represented to the guarantor, and pursuant to such agreement the maker informed the guarantor that the note was paid, and the guarantor thereby lost an opportunity of recoupment, he would be released from liability; but it is *held* that the evidence does not support such a finding.

APPEAL from a judgment of the circuit court for Waupaca county: BYRON B. PARK, Circuit Judge. *Reversed.*

This action was brought to enforce the liability of the defendant as guarantor of a note executed by one Nelson to the plaintiff bank under date of June 15, 1917, for $1,000, due July 15, 1917. The guaranty appears on the back of the note in the following words:

"For value received, I hereby guarantee the payment of the within note at maturity, or at any time thereafter, with interest at the rate of six per cent. per annum, until paid, waiving demand, notice of nonpayment, and protest.
"(Signed)　　A. M. HANSEN."

The maker of the note defaulted in making payment. Although it was customary for the bank to send notice to guarantors about ten days after default, it failed to send such customary notice to the defendant *Hansen* until about December 10, 1917. When the note became due Nelson went to the bank and paid the interest. The matter of the payment of the principal was talked over. Nelson told the cashier that he could pay $600 on the note in a few days, and that he could get *Hansen* to sign a renewal note for the balance of $400. Nelson and the cashier concurred in the opinion that *Hansen* might refuse to sign a renewal note for $1,000 and that it would be better to wait until Nelson could pay the $600 and then ask *Hansen* to sign a renewal note for $400. It seemed to have been realized by both Nelson and the cashier that if *Hansen* knew the note was not paid he might "get stirred up and investigate and take some action." About this time Nelson told *Hansen* that the note at the bank had been paid. The matter ran along. Nelson failed

to pay anything on the note and left the state, after which the bank notified *Hansen* of the condition of affairs and brought this action to recover the amount of the note from *Hansen.*

The action was tried before a jury, which returned the following special verdict: (1) that on or after the note in suit became due the cashier of the plaintiff bank had an understanding with Nelson that the fact of nonpayment by Nelson of the said note should not be disclosed to the defendant *Hansen,* and (2) that the defendant *Hansen* did not have any notification from the bank of the nonpayment of the note prior to December 10, 1917.

Judgment was rendered in favor of the defendant upon such special verdict, and from the judgment so entered the plaintiff bank brings this appeal.

For the appellant there was a brief by *John C. Hart* of Waupaca, attorney, and *William E. Fisher* of Stevens Point, of counsel, and a reply brief signed by *Fisher & Cashin* of Stevens Point; and the cause was argued orally by *William E. Fisher.*

For the respondent there was a brief by *Browne, Browne & Smith* of Waupaca, attorneys, and *B. R. Goggins* of Wisconsin Rapids, of counsel; and the cause was argued orally by *Mr. L. D. Smith* and *Mr. Goggins.*

OWEN, J.    Sec. 1679—1, Stats., specifies the conditions, seven in number, under which a person secondarily liable upon a negotiable instrument may be discharged. It is conceded that the facts found by the jury do not fall within any of the conditions specified in that section. The appellant contends that such conditions are exclusive, and that unless the facts found by the jury fall within some one of those specifications they are not sufficient to operate as a discharge of the defendant. The trial court held "that any agreement by a payee with a maker primarily liable, after the note becomes due, or any other line of action on the part of the

payee which amounts to a fraud on a guarantor, putting him in a materially less favorable position to save himself from loss, will release the guarantor," and that the facts found by the jury fell within the principle so stated. We are inclined to agree with the trial court that action on the part of a creditor after a note becomes due which amounts to a fraud on the guarantor of the note, which misleads him as to the fact of the nonpayment thereof and lulls him into the security that the note has been paid, and by reason thereof the guarantor is placed at a disadvantage and loses an opportunity to recoup and protect himself, may operate to discharge the guarantor, and that sec. 1679—1 does not specify all the instances or contingencies that may arise to release a guarantor. This conduct which will operate as a release of the guarantor, however, cannot arise from mere passivity on the part of the creditor, but it must consist of some affirmative act or connivance or gross negligence amounting to a fraud on the guarantor in order to work his discharge. *Hubbard v. Haley,* 96 Wis. 578, 589, 71 N. W. 1036; *Sentinel Co. v. Smith,* 150 Wis. 231, 136 N. W. 602.

The finding of the jury is that on or after the note in suit became due the cashier of the plaintiff bank had an understanding with Nelson that the fact of nonpayment by Nelson of the said note should not be disclosed to the defendant *Hansen.* The law does not impose upon the creditor any duty to notify the guarantor of the nonpayment of the note by the principal maker. *Hubbard v. Haley, supra; International Textbook Co. v. Mabbott,* 159 Wis. 423, 428, 150 N. W. 429. In the latter case, at page 428, it is said:

"In *Hubbard v. Haley,* 96 Wis. 578, 71 N. W. 1036, this court, in view of a conflict of authorities on the subject, adopted the rule that no notice of the default of an original promisor is required to be given a guarantor of absolute payment or performance to render him liable on the guaranty."

The guaranty in this case is one of absolute payment, hence it falls within the rule above quoted, and the bank was under no obligation to notify *Hansen* of Nelson's default.

True, it was the custom of the bank to notify guarantors about ten days after nonpayment by the principal obligor of such default, but it is not claimed in this case that *Hansen* knew of such custom or relied thereon, or that the contract of guaranty was entered into under such circumstances as to make that custom a part of the contract. On the contrary, notice of nonpayment is expressly waived in and by the terms of the guaranty itself. So, upon the face of the jury's finding, we have a situation where the plaintiff bank is convicted of nonperformance of that which it was under no obligation to perform. It was under no legal obligation to notify *Hansen* of the fact of the nonpayment of the note. Certainly it would not discharge the guarantor by its failure to notify him of such nonpayment when no duty devolved upon it to give such notice. Nor can we perceive how an agreement with Nelson on the part of the bank to do that which it had a right to do, or, stated in another way, to refrain from doing that which it was not required to do, constituted conduct on its part amounting to such fraud as would release *Hansen*. It was under no obligation to notify *Hansen* of the nonpayment of the note, and *Hansen* cannot claim to be discharged from payment thereof by reason of any mere passive failure on the part of the bank to so notify him, no matter what the reasons were prompting the bank to that course of action.

But it is argued here that the finding of the jury should be construed as an agreement between the bank and Nelson to actively suppress the fact from *Hansen* that the note had not been paid. This is argued because after a conversation between Nelson and the cashier of the bank, which will hereinafter be referred to, Nelson told *Hansen* that the note was paid. While conceding that if the cashier and Nelson agreed that the fact of nonpayment should be misrepresented to

Farmers State Bank v. Hansen, 174 Wis. 100.

*Hansen* and that he should thereby be lulled into security in the belief that the note had been paid and that Nelson, as the result of such agreement and pursuant to an understanding with or acquiescence on the part of the bank, falsified that fact to *Hansen,* and *Hansen* had thereby lost an opportunity to recoup himself, such conduct would amount to a fraud which would release the guarantor, we are of the opinion that the evidence fails to support any such finding.

Nelson's deposition, taken in behalf of the defendant, was read at the trial, and with reference to the subject under consideration he said:

"When that note became due in July, 1917, the bank sent me notice, and I went in and saw them and paid the interest. I talked with Mr. Skinner about the note; that I thought I would be able to do something on it in a short time. Mr. Skinner said to let the note run for a little while. At that time I gave him a new note for $1,000. I said, 'I will sell a couple of cars and figure on raising about $600 within the next month.' I told Skinner that I would want to pay this on that note before I asked *Mr. Hansen* to sign another note, because I knew that *Mr. Hansen* would not sign another note for $1,000, but might sign one for less. Mr. Skinner said no doubt that would be the best way; if I went and paid what I could, *Hansen* would no doubt help me a little more. I told *Mr. Hansen* I had been at the bank and I had seen Mr. Skinner about the note, and that it was fixed up satisfactorily, and would come out all right. After that I did not say anything to *Mr. Hansen* about that note. Mr. Skinner and I talked over what *Hansen* might do if he was asked to sign a new note for $1,000; if *Hansen* was asked to sign a new note for $1,000 he might investigate, and we finally agreed that it would be better to wait. We thought he might want the matter settled at once. Both Mr. Skinner and I were afraid he might take some action against me."

This is the testimony upon which a conspiracy or fraudulent purpose on the part of the bank must be sustained. This fails to establish the fact that Skinner, the cashier of the bank, agreed to actively suppress the facts from *Hansen,* or an agreement that Nelson should do so. It is true that

Nelson did tell *Hansen* that the note had been paid, but the evidence completely fails to connect the bank with such misrepresentation. Nelson's evidence, above quoted, clearly indicates that he talked the matter over with the cashier and it was the judgment of both that it might be better to let the $1,000 note stand until Nelson could make a $600 payment, when *Hansen* would probably willingly sign a renewal note of $400 for the balance. There was no extension of the time of payment, there was no misrepresentation of the fact of nonpayment on the part of the bank, there is no evidence that the bank suggested that Nelson should misrepresent the fact; nothing except an understanding between Nelson and the cashier that the $1,000 note should be permitted to stand until he could make a part payment, at which time *Hansen* would probably consent to become a guarantor upon a note for the balance of $400. This, in our opinion, fails to establish such fraud on the part of the bank as to release the guarantor. In fact, it does not establish any fraud on the part of the bank. The bank in dealing with the note merely pursued a course of conduct which it was entirely lawful for it to pursue. The only thing the bank did was to fail to notify *Hansen* that the note remained unpaid. The law cast upon the guarantor the duty of ascertaining whether or not the note had been paid. He failed to make any inquiry at the bank. He seemingly accepted Nelson's word that it had been paid. While Nelson falsified in this particular, the evidence fails to connect the bank therewith and, as a consequence, the bank cannot be held responsible for Nelson's falsification or fraudulent conduct.

The evidence fails to establish any conduct on the part of the bank which amounts to a release of the guarantor, and judgment should have been rendered in its favor.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment in favor of the plaintiff for the amount due on the note.